[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10099

_____

ANDREW RICHARD LUKEHART,

Petitioner-Appellant,

*versus*

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:12-cv-00585-TJC-PDB

_____

Before GRANT, LAGOA, and BRASHER, Circuit Judges.

GRANT, Circuit Judge:

Andrew Lukehart was sentenced to death by a Florida court for the murder of a five-month-old baby. After an unsuccessful direct appeal and two rounds of state collateral proceedings, he sought habeas corpus relief in federal court. In this appeal from the denial of his federal petition, we consider Lukehart's claims that the state trial court violated his right against self-incrimination under the Fifth Amendment when it admitted his confessions and other statements he made to the police into evidence at his trial, and that his trial attorney provided ineffective assistance at the penalty phase in violation of the Sixth Amendment.

## I.

### A.

At the time of the murder, Lukehart lived with his girlfriend, Misty Rhue; Rhue's two daughters, two-year-old Ashley and five-month-old Gabrielle; and Rhue's father and uncle. At around 5:00 in the evening on February 25, 1996, after Lukehart, Rhue, and the children returned from running errands, Rhue took Ashley into the bedroom for a nap while Lukehart took care of Gabrielle in another room. Rhue heard Gabrielle laughing and Lukehart did "some baby talk with her." At one point, Lukehart came into the bedroom to get a clean diaper for the baby.

At about 5:15 p.m., Rhue heard her car starting in the driveway. She looked out the window and saw Lukehart getting ready to leave in her car. Rhue searched the house for the baby and could not find her. Half an hour later, Lukehart called Rhue from a convenience store and told her that someone in a blue Chevrolet Blazer had kidnapped Gabrielle from the house. Lukehart said that he had chased the Blazer in Rhue's car but had not been able to catch the kidnapper.

Lukehart showed up next in a rural area of nearby Clay County at the home of a Florida Highway Patrol trooper, Richard E. Davis. Trooper Davis's marked patrol car was parked in the driveway. A police helicopter was circling overhead. Davis, who had just learned that the helicopter was searching for a white male in connection with the possible kidnapping of a five-month-old baby, went outside and saw Lukehart (a white male) walking toward him. Lukehart raised his hands and said, "I'm the one they're looking for."

Trooper Davis handcuffed Lukehart and asked him where the baby was. Lukehart responded "I don't know what the hell you [sic] talking about, read me my rights." Davis did not read Lukehart his rights, but he didn't ask him any more questions, either. He called the police, and a Clay County Sheriff's deputy responded in less than a minute.

The deputy, Jeff Gardner, was close by because he had been called to investigate a vehicle accident a block from Trooper Davis's house. Rhue's car had been driven off the road and left in

the woods with the key in the ignition and the transmission in drive. After finding the car, Gardner called in the license plate and was told that it belonged to Lukehart and may have been involved in an abduction. The police dispatcher told Gardner that Lukehart had turned up in Trooper Davis's yard, and Gardner immediately drove the short distance to Trooper Davis's house.

When he arrived at Trooper Davis's house, Gardner saw Lukehart standing in the yard with his hands cuffed behind his back and Trooper Davis standing right behind him. Gardner walked up to Lukehart and asked him what was going on. Lukehart responded, "I don't want to speak to anybody until I see a lawyer." Gardner asked again what was going on, and Lukehart responded that he had just tried to hang himself from a tree with his t-shirt. Gardner asked Lukehart if he would accompany him back to the area where he had abandoned Rhue's car, and Lukehart agreed.

Gardner removed Trooper Davis's handcuffs and replaced them with his own. He then put Lukehart in the back of his marked police car and drove him to the wooded area where Lukehart had left Rhue's car. During the quarter-mile drive, Gardner did not ask Lukehart any questions, but Lukehart indicated a tree and volunteered that that was where he had tried to hang himself. By the time Gardner and Lukehart reached Rhue's car, several other officers had arrived and were searching the woods for the missing baby. Gardner and a Jacksonville Sheriff's officer, Richard G. Davis, stood with Lukehart near Gardner's patrol car while the search continued.

Officer Davis initially tried to question Lukehart about where the baby was and what had happened during the supposed abduction.  Lukehart responded by asking again for a lawyer, and Davis stopped questioning him.

But Lukehart did not stop talking.  Over the next hour, while Davis and Gardner waited for detectives to arrive and decide what should be done with Lukehart, he stood next to the patrol car smoking cigarettes and periodically making unsolicited remarks.  At one point, Lukehart looked at the ground, shook his head, and said he wished "she hadn't shit in her diaper."  Later, he said the situation was "not going to look good on" him.  Gardner asked him what he meant, and he said that he had been arrested for child abuse before but that he "didn't do it."  He also said that he had tried to hit a telephone pole with the car, but missed, and that his girlfriend was going to be mad and not let him live with her anymore because "they" had "gotten away."

Lukehart also said several times during this waiting period that he wanted to tell his "side of the story."  Officer Davis told him that detectives were coming from Jacksonville, and he could talk to them if he wanted to.  Lukehart said that he did want to talk to the detectives.

When Jacksonville Sheriff's Office Detective L. H. Goff arrived, one of the officers informed him of Lukehart's request to talk.  Goff found Lukehart sitting (still handcuffed) in the back of a patrol car.  He told Lukehart that he understood that Lukehart had asked to speak to a detective, but that he had also asked for a

lawyer. Lukehart said that he had asked for a lawyer because he heard the officers talking about prior arrests. Goff asked if Lukehart wanted to talk to him, and Lukehart said that he did.

Goff responded that since Lukehart had asked for a lawyer, he wanted to go through Lukehart's constitutional rights with him first. He read Lukehart his *Miranda* rights from a printed card. Lukehart interrupted to say that he understood his rights, but Goff continued, reading each warning word for word from the card. He then asked Lukehart if he understood his rights and still wanted to talk with him, and Lukehart said that he did. Lukehart told Goff the same story that he had told Rhue; that is, that someone in a blue Blazer had abducted Gabrielle from Rhue's house in Jacksonville, and Lukehart had chased the kidnapper before stopping at a convenience store to call Rhue.

Over the next 18 hours, Lukehart made several more statements to police officers and waived his *Miranda* rights several more times. Soon after Lukehart spoke with Detective Goff, he was interviewed by Detective Aaron Reddish of the Jacksonville Sheriff's Office. Before interviewing him, Detective Reddish read Lukehart his *Miranda* rights again, and Lukehart said again that he understood his rights and wished to talk. Lukehart stuck with his abduction story, though he changed some of the details.

Officers drove Lukehart back to Rhue's house and then to the Jacksonville Sheriff's Office, where they kept him in an interview room all night. At Detective Reddish's request, Lukehart waived his *Miranda* rights again at the Sheriff's Office, this time by

signing a written waiver-of-rights form.  At some point during the night, the officers removed Lukehart's handcuffs.

Early the next morning, Lukehart agreed to show Detective Reddish the route he traveled when chasing the fictional kidnapper.  Lukehart directed Reddish from Rhue's house first to the convenience store where he had called Rhue and then to the wooded area in Clay County where Lukehart had run off the road in Rhue's car.  On the way, they stopped for breakfast and to buy Lukehart some clothes.

By the time they arrived at the end of Lukehart's route, the site where he had left Rhue's car had become a "command post" where Clay County officers coordinated the search for Gabrielle. The area swarmed with police officers searching on foot, on four-wheelers, by car, and by helicopter.  A police dive team had been called in to search nearby ponds.  Detective Reddish left Lukehart sitting in the front seat of his unmarked police car near the command post while he went up in the helicopter to show his colleagues the route that Lukehart had explained to him.

One of the Clay County Sheriff's officers, Lieutenant Jimm Redmond, joined Lukehart in Reddish's car and asked him to go over his story again.  As they sat talking, someone handed Redmond a picture of Gabrielle.  The picture upset Lukehart; he told Redmond he did not want to look at it.  Redmond told Lukehart that he didn't believe his abduction story and he encouraged Lukehart to help him find the baby—to get her out of

the hot sun if she was still alive, or to give her a decent burial and to give the family closure if she was dead.

Lukehart confessed to Redmond that the abduction story was not true and that he was responsible for Gabrielle's death. He said that he had been holding the baby and changing her diaper when she squirmed and he accidentally dropped her on her head. He said that he snatched the baby up and shook her hard, trying to revive her. He tried mouth-to-mouth resuscitation, without success. He put the baby in the car, drove her a few miles away to the end of a lime-rock road, and threw her body into a shallow pond.

Lukehart led the police to the pond where he had left Gabrielle, and they soon recovered her body. She was still wearing her soiled diaper. Redmond asked Lukehart to provide a written account of Gabrielle's death, and Lukehart did so after being read his *Miranda* rights again and signing another waiver-of-rights form.

## B.

Lukehart was indicted on one count of first-degree murder and one count of aggravated child abuse. Before trial, he moved to suppress the statements he had made to the police, including his initial lies and his ultimate confessions. The trial court denied the motion, and the State relied heavily on Lukehart's statements at trial.

The State also called the medical examiner, who testified that Gabrielle's injuries were inconsistent with Lukehart's story

that he had accidentally dropped her on her head. The baby sustained not just one but five separate impacts to the head, two of which caused skull fractures and were independently fatal. The skull fractures could have been caused by hard blows with a closed fist; they could not have been caused by accidentally dropping the baby on her head from a height of only four or five feet.

Lukehart testified during the guilt phase of trial. He admitted that he had lied when he told police that he had dropped the baby on her head. He said that he had been trying to change Gabrielle's diaper while she lay on the floor at Rhue's house, but she kept pushing up on her elbows. He repeatedly pushed her head and neck back down on the floor, he said, using "quite a bit" of force. The last time he did it, she stopped moving. Lukehart testified that he tried mouth-to-mouth resuscitation, but he was unable to revive her.

The jury found Lukehart guilty of first-degree murder and aggravated child abuse, as charged.

During the penalty phase, the State presented evidence that less than two years before Gabrielle's murder, another child in Lukehart's care—an eight-month-old girl named J.F.—was hospitalized with a severe head injury, retinal hemorrhages, broken ribs, and older unhealed injuries including broken bones in her arm and leg. A social services case worker reported the baby's injuries to police. The investigating officer interviewed Lukehart, who had accompanied J.F. to the hospital. Lukehart said that he had left J.F. alone in the bathtub for several minutes and returned

to find her apparently lifeless on her back in the tub. He said that he performed CPR until the baby revived and then told another child in the house to call 911.

When the officer asked about the baby's broken ribs, Lukehart said that he could have broken the ribs when he performed CPR. When asked about her broken arm and leg, Lukehart told three different stories. First he said that the bones were broken a few days earlier when he had fallen down while holding the baby. Then he said that he had lied and the baby's mother might have broken the baby's bones. Last, he said that he might have broken the baby's arm and leg when he yanked her out of the tub.

But Lukehart's story was inconsistent with the opinion of J.F.'s attending physician, who told the officer that he found no indication of drowning and that the baby's injuries were caused by physical abuse. One of J.F.'s treating physicians testified that the baby's head injury was likely caused by being struck in the head with "a fair amount of force," and that the retinal hemorrhages indicated that J.F had been "shaken around a lot, very recently." The doctor did not give an opinion as to the cause of the baby's broken bones; she testified that the baby's right arm was broken in two places and her left leg was broken, and that these injuries appeared to be somewhat older than her acute head injury. The head injury caused J.F. to have a seizure while she was in the hospital, and she had visual deficits from the retinal hemorrhages.

Lukehart was arrested at the hospital for aggravated child abuse in connection with J.F.'s injuries. He entered a negotiated guilty plea to felony child abuse and was sentenced to ten months in prison and four years of probation. As special conditions of his probation, Lukehart was required to complete parenting and anger-management courses, to have no contact with minor children until he completed those courses, and to have no further contact with J.F.

Lukehart's probation officer testified that Lukehart completed the required classes before he moved in with Gabrielle's mother. The probation officer conducted at least one home visit while Lukehart lived with Rhue and her children and did not observe any violations of his probation. He was still on probation for the felony child-abuse offense at the time of his arrest for Gabrielle's murder.

Lukehart also called witnesses to testify during the penalty phase. His defense attorney from the felony child-abuse case testified that while Lukehart was in jail awaiting trial for the prior offense, Lukehart told her that he was "ready to snap and possibly hit somebody" and that he wanted to make a plea deal for time served so that he could get out of jail. He also told her that he had "some problems upstairs" (meaning psychological problems), including paranoia, and that he wanted to get inpatient treatment rather than be in jail. The attorney referred Lukehart to a psychologist, Dr. Harry Krop, for an evaluation.

Dr. Krop testified that he evaluated Lukehart in 1994 in connection with the felony child-abuse case and found him to be "a very seriously disturbed individual." He explained that Lukehart had been sexually abused as a child and that he had struggled with depression, anger, and poor coping skills throughout his life. Dr. Krop felt at the time that Lukehart needed long-term psychological treatment in a residential facility where he could be "off the streets" while he received help. He further testified that the anger control and parenting classes that were part of Lukehart's probation were inadequate to address his problems.

Dr. Krop reevaluated Lukehart in 1997 after Gabrielle's murder and affirmed that he remained a "seriously disturbed individual." He diagnosed Lukehart with (1) intermittent explosive disorder (characterized by "discrete episodes of failure to resist aggressive impulses that result in serious assaultive acts or destruction of property" where the degree of aggression is "grossly out of proportion" to the precipitating stressor); (2) substance abuse, especially alcohol; (3) post-traumatic stress disorder from childhood sexual abuse; and (4) personality disorder with antisocial, immature, and borderline features. Dr. Krop also testified that Lukehart had an IQ of 79, which was in the borderline range of intellectual disability. In Dr. Krop's opinion, Lukehart exploded on the day of Gabrielle's death not from her soiled diaper, but because he could not cope with trying and failing to care for the child—and whatever he did to stop the child crying just seemed to escalate the situation.

Lukehart also presented testimony by several family members who described the abuse and tragedy that Lukehart endured as a child and young adult. Their evidence showed that Lukehart's father was an alcoholic who physically and emotionally abused Lukehart and his sister until Lukehart was at least four or five years old. When Lukehart was about ten years old, an uncle who was Lukehart's supporter and confidant died. At around the same time, another uncle began sexually abusing Lukehart. When he was 17 or 18 years old, his sister Jennifer died in a car accident, which distressed Lukehart and made him almost suicidal.

Lukehart began showing signs of mental and emotional problems when he was still a child. His parents were not aware of the sexual abuse and did not understand the extent of Lukehart's psychological problems. They sent him to counseling, but only sporadically and never for very long. In ninth grade, one teacher reported that she was afraid that Lukehart would harm himself. Counseling records from when Lukehart was 16 years old showed that he was "clearly a disturbed individual" and that family dynamics contributed significantly to his emotional issues.

Lukehart was introduced to drugs and alcohol at an early age. His father first gave him alcohol when he was 4 years old, and he was drinking heavily by the time he was 13. Lukehart began using marijuana when he was only 8.

The jury recommended a death sentence for the murder charge by a vote of nine to three. The court sentenced Lukehart

to death for first-degree murder and to 15 years in prison for aggravated child abuse.

Lukehart appealed his convictions and sentences to the Florida Supreme Court, asserting a laundry list of errors at trial and sentencing.  Chief among his trial claims was his argument that the court erred in denying his motion to suppress his confession and other statements to the police.  He argued that the admission into evidence of his statements violated his Fifth Amendment rights under *Miranda v. Arizona* and *Edwards v. Arizona* because the police did not initially advise him of his *Miranda* rights and continued to question him after he asked for a lawyer.  Lukehart also contended that the police later coerced his confession—by repeatedly advising him of his *Miranda* rights, by showing him a picture of Gabrielle, and by telling him that they needed to find the baby's body so that she could have a Christian burial.  The Florida Supreme Court rejected his *Miranda* claims, reasoning that Lukehart was not in custody until after officers read him his rights and that after he asked for a lawyer, the police stopped questioning him until he asked to speak to the detectives and voluntarily waived his rights.  *Lukehart v. State*, 776 So. 2d 906, 917–20 (Fla. 2000).

Lukehart subsequently filed two motions for state postconviction relief, arguing (among other things) that he received constitutionally ineffective assistance of counsel during the penalty phase of trial.  The state circuit court denied both motions, and the Florida Supreme Court affirmed the denial of the

motions on appeal. *Lukehart v. State*, 103 So. 3d 134, 135 (Fla. 2012); *Lukehart v. State*, 70 So. 3d 503, 508 (Fla. 2011).

Lukehart turned to the federal courts, filing a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court denied his petition but granted a certificate of appealability on his *Miranda* claim. On appeal, we granted his motion to expand the certificate to include his claim that his trial counsel was ineffective at the penalty phase for failing to mitigate the State's evidence related to his prior conviction for felony child abuse.

## II.

Lukehart's federal habeas petition is governed by 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). Under AEDPA, when a state court has adjudicated the petitioner's claim on the merits, as the Florida Supreme Court did in this case, a federal court may not grant habeas relief unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

The phrase "clearly established Federal law" refers to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v.*

*Andrade*, 538 U.S. 63, 71–72 (2003). A state court decision is "contrary to" those principles if it contradicts them on a settled question of law or arrives at a different result than the Supreme Court did in a case with materially indistinguishable facts. *Id.* at 73. A decision involves an "unreasonable application" of Supreme Court precedent if the state court identifies the correct governing principle from the Supreme Court's holdings but unreasonably applies it to the facts of the petitioner's case. *Id.* at 75. "Unreasonable" in this context means more than just erroneous; a "state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation omitted); *see Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022).

AEDPA's standard is intentionally difficult to meet. *Richter*, 562 U.S. at 102. And this demanding statutory standard is not the only precondition to federal habeas corpus relief—among other equitable doctrines developed in an effort to return "the Great Writ closer to its historic office," the Supreme Court has held that "a state prisoner should not receive federal 'habeas relief based on trial error unless' he can show the error had a 'substantial and injurious effect or influence' on the verdict." *Davenport*, 142 S. Ct. at 1523 (first quoting *Edwards v. Vannoy*, 141 S. Ct. 1547, 1570 (2021) (Gorsuch, J., concurring); and then quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This harmless-error inquiry is separate from the AEDPA analysis, and "a federal court must *deny* relief to

a state habeas petitioner who fails to satisfy either" the *Brecht* harmless-error test or AEDPA.  *Id.* at 1524 (emphasis in the original).

With this background, we turn to the relevant state court decisions: the Florida Supreme Court's rejection of Lukehart's *Miranda* claim on direct appeal, and its rejection of his ineffective-assistance claim during state postconviction relief.  *Lukehart*, 776 So. 2d at 917–20; *Lukehart*, 70 So. 3d at 512–14.

## A.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  In service of this right, the Supreme Court held in *Miranda v. Arizona* that the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. 436, 444 (1966).  In other words, a statement made by a suspect in custody in response to police interrogation is inadmissible against him at trial unless the police first advised him of his so-called *Miranda* rights, including the right to remain silent and the right to an attorney, and he knowingly and voluntarily waived those rights.  *Id.* at 478–79. Once a suspect invokes his right to an attorney, police interrogation must stop "until counsel has been made available to him, unless the accused himself initiates further communication,

exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

Lukehart argues that the Florida Supreme Court unreasonably applied *Miranda* and *Edwards* when it affirmed the trial court's denial of his motion to suppress the statements he made to police after he invoked his right to counsel. Specifically, Lukehart argues that the state court unreasonably determined that (1) he was neither in police custody nor subjected to interrogation before detectives read him his *Miranda* rights, and (2) after initially invoking his right to counsel, he voluntarily reinitiated the interrogation process by asking when he would be allowed to tell his side of the story.

Like the district court, we have concerns about the Florida Supreme Court's custody analysis. The state court determined that Lukehart was not in police custody for the first several hours after he turned himself in to Trooper Davis—despite being handcuffed and escorted everywhere by police officers—because the officers handcuffed him for his own protection after he reported that he had tried to kill himself. *Lukehart*, 776 So. 2d at 917. The Supreme Court has repeatedly explained, however, that police officers' subjective, undisclosed reasons for detaining a defendant are irrelevant to the *Miranda* custody determination. *See, e.g.*, *Stansbury v. California*, 511 U.S. 318, 323 (1994); *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

But we need not engage in the custody analysis ourselves, because even if we assume that Lukehart was taken into custody

as soon as Trooper Davis handcuffed him, custody alone does not implicate *Miranda*. *Miranda* warnings are required only where a suspect is both in custody *and* being interrogated. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). "'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* The "*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Id.* at 300–01.

Only two of the pre-*Miranda* statements that Lukehart moved to suppress were made in response to direct questioning by the police. First, in response to Trooper Davis's question asking Lukehart where the baby was, Lukehart said that he did not know what the hell Davis was talking about and demanded that Davis read him his rights. Second, when Deputy Gardner asked Lukehart "what's going on," Lukehart said that he had just tried to kill himself. The introduction of these statements at trial, even if their admission was error under *Miranda*, does not warrant habeas corpus relief.

Constitutional trial error does not entitle a federal habeas petitioner to relief unless the petitioner can establish that the error resulted in "actual prejudice." *Brecht*, 507 U.S. at 637 (quotation omitted). "Actual prejudice" means that "the error had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quotation omitted). The erroneous admission of evidence is likely to be harmless under this standard "where there is significant

corroborating evidence or where other evidence of guilt is overwhelming." *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1313 (11th Cir. 2012) (citations omitted).  Such is the case here.

In the context of the numerous other voluntary and admissible statements Lukehart made, his initial statement denying knowledge of the baby's whereabouts and his first report that he had tried to kill himself likely had no impact at all on the jury's verdict or sentencing recommendation.  By the time Lukehart encountered Trooper Davis, he had already denied responsibility for Gabrielle's disappearance by telling Rhue that someone had kidnapped the baby, a story that he repeated several times to police officers after having waived his *Miranda* rights.  And similarly, Lukehart made several other voluntary and admissible statements about having tried to commit suicide, both before and after being read his *Miranda* rights.

In fact, the first of many spontaneous statements that Lukehart made to the police was his remark to Deputy Gardner as they drove away from Trooper Davis's house, pointing out the tree where he said he had tried to hang himself with his t-shirt. Lukehart does not contend that this statement was in response to police questioning; Deputy Gardner did not ask him any questions during the short ride from Trooper Davis's house to Rhue's car. "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.  The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without

the benefit of warnings and counsel, but whether he can be interrogated." *Miranda*, 384 U.S. at 478. Lukehart's statement about the tree was thus indisputably admissible.

The same is true of the other spontaneous remarks that Lukehart made while he stood next to Gardner's patrol car smoking cigarettes and waiting for the detectives to arrive from Jacksonville. Voluntary and spontaneous statements made by a suspect are admissible in evidence whether or not the suspect has previously requested an attorney, as long as the statements are not made in response to questioning by the police. *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991).

Although the admissibility of spontaneous statements is not affected by a suspect's prior request for an attorney, statements made in response to police interrogation are another matter. Interrogation must stop once such a request is made until an attorney is provided, unless the suspect himself initiates further discussions with the police. *Edwards*, 451 U.S. at 484–85.

Lukehart argues that the Florida Supreme Court's determination that his repeated requests to tell his "side of the story" were sufficient to initiate renewed conversations with the police was unreasonable because he did not specifically ask to tell his story to the detectives. But that level of specificity is not required; police may resume questioning a suspect who has previously invoked his right to an attorney if the suspect's subsequent unsolicited statements show "a willingness and a desire for a generalized discussion about the investigation." *Oregon v.*

*Bradshaw*, 462 U.S. 1039, 1045–46 (1983) (plurality opinion) (no *Edwards* violation where suspect initiated further conversation with police by asking "Well, what is going to happen to me now?").

If there were any doubt that Lukehart wanted to give a statement to the police, it was resolved when Detective Goff referred to his earlier request to speak with an attorney and Lukehart clarified that he had changed his mind and wanted to talk. The *Edwards* rule is meant "to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights"; it is not intended to prevent a suspect from voluntarily speaking to the police. *Davis v. United States*, 512 U.S. 452, 458, 460 (1994) (quotation omitted).

## B.

We turn next to Lukehart's claim for relief from his death sentence. Lukehart argues that his attorney provided constitutionally ineffective assistance at the penalty phase of trial by failing to thoroughly investigate his prior felony child-abuse offense and failing to call an available witness to mitigate the effect of the State's evidence about that offense.

To succeed on a claim that he received ineffective assistance of counsel, a defendant must first show that counsel's performance was deficient—that is, "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). After that, he "must show that the

deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

The *Strickland* standard sets a "high bar." *Richter*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). Even under de novo review, *Strickland* requires that we apply "a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. When AEDPA applies, the petitioner also carries the heavy burden of establishing that the state court's application of *Strickland* was unreasonable under § 2254(d). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted).

In determining whether counsel's performance was deficient, the inquiry is "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. This is an objective standard; the measure of performance "remains simply reasonableness under prevailing professional norms." *Id.*; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

Defense counsel's job at the sentencing phase of a capital trial is "to counter the State's evidence of aggravated culpability with evidence in mitigation." *Rompilla v. Beard*, 545 U.S. 374, 380–81 (2005). Counsel's "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539

U.S. at 524 (emphasis in the original) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989)).    Where counsel knows that the prosecution will seek to introduce evidence related to a prior conviction at the penalty phase, counsel must, at a minimum, obtain and review the available file on the prior conviction. *See Rompilla*, 545 U.S. at 383–90.

Lukehart's trial attorney, Michael Edwards, knew that the State intended to rely on his prior conviction for child abuse as an aggravating factor in the penalty phase. He investigated the prior conviction by obtaining the case file from the public defender's office, reviewing it (including the public defender's notes), and discussing the case with the former attorney. As part of his review, Edwards read the deposition of Brenda Page, who lived with Lukehart, J.F. (the child), and Monica Plummer (the child's mother) at the time of the earlier offense.

From these sources, Edwards knew that Lukehart claimed that he was innocent of the prior crime and that Plummer had caused J.F.'s injuries. He knew that Lukehart's former attorney thought that Lukehart had a good chance of acquittal, based in part on Page's deposition, but that Lukehart had decided to plead guilty as part of a plea deal because he wanted to get out of jail.

Edwards also knew that Page had provided testimony at her deposition that might have some mitigating value if she were called at the penalty phase of the capital murder trial: she testified that Lukehart loved J.F. and held her, fed her, and changed her diapers

more than her own mother did.  Page also testified that Plummer was jealous of the attention that Lukehart paid to J.F.  A few days before J.F. was hospitalized with the injuries that formed the basis for Lukehart's child-abuse conviction, Page said, Plummer threw J.F. across the room at Lukehart.  Page thought the baby landed on the bed, but she really didn't know; she might have landed on the hardwood floor.  If she had landed on the floor, Page would have expected her to have a head injury.

But Page's deposition testimony was not all positive for Lukehart.  She testified that Lukehart would yell at the baby when she cried; he had a very deep, loud voice that sent "shivers down [Page's] spine" when he yelled.  When asked whether she thought that Lukehart abused J.F., Page said she thought that "mental abuse" had occurred because of how much Lukehart yelled at the baby.  Page heard Lukehart slap or spank the baby once for crying, and she heard both Lukehart and Plummer say that they were "giving the baby something to cry about."  Page also testified that she noticed on one occasion that one of the baby's arms was "limp."  When Page and her boyfriend asked what had happened to the baby's arm, Lukehart said that Plummer had done it, and Plummer said that Lukehart had done it; after some argument, the two decided that J.F. must have hurt herself when crawling.  Page offered to take the baby to the hospital, but Lukehart and Plummer both said no, she would be fine.

In rejecting Lukehart's ineffective-assistance claim, the Florida Supreme Court correctly identified *Strickland* as setting out

the relevant clearly established federal law. *Lukehart*, 70 So. 3d at 512; *see Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). The court held that Edwards's performance was not constitutionally deficient; he conducted a reasonably thorough investigation into Lukehart's prior felony conviction and made a reasonable strategic decision not to present mitigating testimony that could open the door to damaging evidence.[1] *Lukehart*, 70 So. 3d at 513–14. This determination was not an unreasonable application of *Strickland*.

Lukehart argues that counsel's investigation into the prior felony was deficient because he failed to interview Page. But he does not identify any potentially helpful information that counsel should have expected Page to provide that was not already included in her deposition testimony. Although he highlights some favorable changes in Page's testimony between her 1994 deposition and the state evidentiary hearing in 2009, he does not explain why counsel should have anticipated that she would change her story to benefit him.

Lukehart also argues that his counsel provided ineffective assistance by failing to call Page to testify during the penalty phase. He contends that Page's testimony would have reduced the weight of the prior felony aggravator by showing that he had a loving and

---

[1] The state court also held that counsel's failure to call Page to testify did not prejudice Lukehart. *Lukehart*, 70 So. 3d at 514. Because Lukehart cannot meet the performance prong of the *Strickland* test, however, we need not reach the prejudice prong. *Ward v. Hall*, 592 F.3d 1144, 1163 (11th Cir. 2010).

caring relationship with J.F., and that Plummer, not Lukehart, was responsible for the baby's injuries.  If Edwards had called Page to testify, however, he would have had to accept the bad things that Page had to say about Lukehart along with the good.

Instead, counsel chose to focus on evidence that Lukehart had serious psychological problems at the time of the prior offense that had not resolved by the time of the murder.  He pursued this strategy by calling Lukehart's former defense attorney to testify that Lukehart said he had "problems upstairs" and asked for residential psychological treatment.  Edwards also called the psychologist who evaluated Lukehart near the time of the prior conviction and after the murder to testify that Lukehart had not received the treatment he needed after the prior offense and remained "seriously disturbed" at the time of the murder.  That strategy of dealing with the prior felony aggravator dovetailed with the other evidence counsel presented during the penalty phase regarding Lukehart's childhood abuse and history of psychological problems.

Lukehart's argument that a different strategy would have been better does not meet his burden under *Strickland*—"counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken might be considered sound trial strategy."  *Ward v. Hall*, 592 F.3d 1144, 1164 (11th Cir. 2010) (quotation omitted).  It "is reasonable—and not ineffective—for trial counsel to eliminate certain lines of presentation if he has misgivings about hurtful cross-examination and rebuttal

witnesses." *Id.* at 1168 (quotation omitted). And more importantly for our purposes, the state court's determination that counsel's performance was adequate under *Strickland* was not objectively unreasonable. *See Richter*, 562 U.S. at 105.

★      ★      ★

No doubt Andrew Lukehart regrets some of the unsolicited comments he made to the police only hours after he murdered a five-month-old baby. He may also regret his decision to tell the police the abduction story he made up to explain her disappearance, or the story about accidentally dropping the baby on her head. But—with two exceptions that amount to, at most, harmless error—the state court's admission of his statements at trial did not violate Lukehart's constitutional rights because he made those statements either spontaneously or after reinitiating discussions with police and knowingly and voluntarily waiving his *Miranda* rights.

Lukehart also believes that, in hindsight, his trial attorney's strategy for dealing with his prior child-abuse conviction was incompetent at a constitutional level. But a strategic decision not to call a witness whose testimony is not entirely problem-free and to focus instead on other available mitigating evidence does not amount to a deprivation of the Sixth Amendment right to counsel, and the state court's decision to that effect was not objectively unreasonable.

21-10099                Opinion of the Court                29

The district court's denial of Lukehart's federal habeas petition is **AFFIRMED.**