IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 12, 2025 Session

**STATE OF TENNESSEE v. WILLIAM EUGENE MOON**

**Appeal from the Circuit Court for Coffee County**
**No. 44905F   William A. Lockhart, Judge**

_____

**No. M2024-00268-CCA-R3-CD**

_____

JEFFREY USMAN, SP.J., dissenting.

The majority opinion offers a thoughtful examination of this challenging case. I agree with much of the majority's well-stated analysis, but there is a salient point of departure between the majority's understanding and mine. This point of departure relates to whether admission into evidence of Mr. Moon's post-shooting statements to Officer Wilder violates the protections afforded by *Miranda*. I conclude that it does, and, accordingly, respectfully dissent.

The safeguards set forth by the United States Supreme Court via the *Miranda* doctrine apply in circumstances of custodial interrogation. *See, e.g.*, *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977) (noting that "[o]ur decision in *Miranda* set forth rules of police procedure applicable to 'custodial interrogation'"); W. Mark Ward, *Tennessee Criminal Trial Practice* § 5:7 (2024-2025 ed.) (stating that "*Miranda* warnings are required only in situations involving 'custodial interrogation'"). Accordingly, "*Miranda* warnings are required only where a suspect is both in custody *and* being interrogated." *Lukehart v. Sec'y, Fla. Dep't of Corr.*, 50 F.4th 32, 43 (11th Cir. 2022); *see also, e.g.*, Andrew D. Leipold, *1 Fed. Prac. & Proc. Crim.* § 76 (5th ed. 2025) (indicating that *Miranda* "only applies when the person who makes the incriminating statement is both 'in custody' and is 'interrogated'"). Therefore, a defendant must establish both custody and interrogation for *Miranda* to be applicable; contrastingly, for the State to prevail, it need only show either that the defendant was not in custody or that he was not being interrogated.

In addressing the *Miranda* issue before the trial court, the State conceded that Mr. Moon was in custody. On appeal, the State does not argue that Mr. Moon was not in

1

custody, but the State does not expressly concede that he was in custody in its briefing on appeal. The contested ground as to *Miranda*'s applicability reflected in the parties' briefing is whether Officer Wilder interrogated Mr. Moon, not whether Mr. Moon was in custody.

Nevertheless, an assertion set forth by the State in its appellate briefing necessitates quickly addressing whether Mr. Moon was in custody. The State, inaccurately in my view, suggests in its briefing that the trial court concluded that Mr. Moon was not in custody. On appeal, the State does not defend this purported conclusion of the trial court. The State only notes this conclusion in setting forth the trial court's ruling.

I do not share the State's understanding of the trial court's ruling. In the context of a proceeding in which the State conceded before the trial court that Mr. Moon was in custody, challenging only whether he was interrogated, the trial court explained its decision finding *Miranda* to be inapplicable as follows:

> I am going to deny the motion to suppress. I don't think that – I think that the state doesn't argue that it wasn't – he wasn't in custody. So it's not custodial. They argued it was an interrogation. I agree based on the specific facts of this case that it wasn't an interrogation.

Nowhere in addressing this matter did the trial court explain how the restraint imposed upon Mr. Moon would not be custodial; rather, in concluding *Miranda* is inapplicable in the present case, the trial court relied upon the conclusion that no interrogation had occurred. In other words, the phrase "not custodial" appears to be a reference to custody not being the basis of the trial court's ruling as to why *Miranda* is inapplicable in the present case rather than a determination that Mr. Moon was not truly in custody, despite the State's concession that he was.

Even assuming the trial court determined that Mr. Moon was not in custody for purposes of *Miranda*, it is clear this undefended determination would be erroneous. The United States Supreme Court has noted that "[t]o determine whether a suspect was in *Miranda* custody we have asked whether 'there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) (quoting *New York v. Quarles*, 467 U.S. 649, 655 (1984)). The Tennessee Supreme Court has echoed that understanding, indicating that "[i]n determining whether a person is in custody for purposes of *Miranda*, a court must examine the circumstances surrounding the interrogation and inquire 'whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *State v. Northern*, 262 S.W.3d 741, 750 (Tenn. 2008) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)). In applying this test, the question of "whether a suspect is 'in custody' is an objective inquiry." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011).

In the present case, Mr. Moon lay on the ground in extreme distress, unable to move, after having been shot five times by a law enforcement officer. The officer had also informed Mr. Moon that he was going to jail and directed him not to move. Objectively, Mr. Moon experienced a restraint upon his freedom of movement to a degree associated with formal arrest. Simply stated, Mr. Moon was in custody for purposes of *Miranda*. With custody established, the question becomes whether Mr. Moon was interrogated for purposes of *Miranda*. As noted above, this question is the contested ground between the parties in this case in relation to the applicability of *Miranda*.

Turning to this issue, I do not fault Office Wilder for his understandable statements accusing Mr. Moon of having pulled a gun and having attempted to shoot him in the wake of the altercation between the two, which resulted in the officer shooting Mr. Moon. Nevertheless, in my view, faithfully applying the test for assessing whether an officer's words or actions constitute an interrogation as delineated by the United States Supreme Court leads to the conclusion that an interrogation did occur. And, if there was interrogation, it was a custodial interrogation for which no *Miranda* warnings were issued, rendering the statements inadmissible.

In considering whether an officer's words and/or actions constitute an interrogation for purposes of the *Miranda* doctrine, the paradigmatic example of interrogation is the questioning of a suspect by law enforcement.[1] The United States Supreme Court has clearly indicated that *Miranda* safeguards apply, however, not only to "express questioning" but also to its "functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). In defining interrogation for purposes of the application of the *Miranda* doctrine, the United States Supreme Court has indicated that interrogation refers "to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. This is the test this court is charged with applying to determine whether an interrogation has occurred.

Reflecting on the *Innis* and *Miranda* decisions, the Tennessee Supreme Court has observed that the United States Supreme Court has concluded that "certain psychological ploys, such as casting blame on the victim or society, minimizing the culpability of the offender, or minimizing the moral seriousness of a crime are 'techniques of persuasion, no less than express questioning' which 'amount to interrogation.'" *Northern*, 262 S.W.3d at 753 (quoting *Innis*, 446 U.S. at 299, and citing *Miranda v. Arizona*, 384 U.S. 436, 450 (1966) (describing psychological interrogation tactics police officers use "to minimize the

---

[1] Despite being the paradigmatic example of interrogation, not all direct questions actually constitute interrogation. *See*, *e.g.*, *United States v. Briggs*, 273 F.3d 737, 741 (7th Cir. 2001); *see also* Paul Marcus, *When Is Police Interrogation Really Police Interrogation? A Look at the Application of the Miranda Mandate*, 69 Cath. U. L. Rev. 445, 450-58 (2020).

3

moral seriousness of the offense, [or] to cast blame on the victim or on society."")). Additionally, the United States Supreme Court has noted that law enforcement positing the guilt of the suspect can constitute interrogation. *Innis*, 446 U.S. at 299.

Regarding what constitutes an "incriminating response," the United States Supreme Court expressly indicated that in using this terminology "we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." *Id.* at 301 n.5.[2] Explaining the expansive scope of its understanding of "incriminating response," the United States Supreme Court drew on *Miranda* itself, noting the observation therein that

> no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory'. If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement.

*Id.* (quoting *Miranda*, 384 U.S. at 476-77).

In the present case, Officer Wilder, over the course of more than seven intense minutes, engaged in a dialogue with bystanders and Mr. Moon. Understandably, Officer Wilder used a loud and agitated voice to repeatedly accuse Mr. Moon of having pulled a gun on him, and he also accused Mr. Moon of having tried to shoot him. These accusations were interspersed with a variety of commands issued to bystanders and to Mr. Moon directly that were focused upon controlling the scene as well as tending to Mr. Moon's medical needs. Meanwhile, Mr. Moon, having been shot five times from a close distance, was in extreme pain and distress. Regarding the accusations leveled against Mr. Moon, Officer Wilder, in Mr. Moon's presence, before Mr. Moon made any comment in response, repeatedly leveled serious and evocatively stated accusations against him: (1) "He pulled a fucking gun on me. He had warrants."; (2) "I shot him. He pulled a damn gun on me."; (3) "Really? He pulled a damn gun on me."; (4) "Yeah? Well somebody just pulled a gun on me and tried to shoot me."; (5) "I didn't know that you knew. But he shouldn't have pulled a gun on me."; and (6) "Really? He pulled a gun on me. Be quiet."

Mr. Moon eventually responded to these accusations by stating, "I wasn't gonna shoot you," and asking, "Why'd you do that? Why'd you do all that?" Officer Wilder

---

[2] Exculpatory evidence tends "to establish a defendant's innocence" while inculpatory evidence tends "to show one's involvement in a crime or wrong." *Evidence*, Black's Law Dictionary (12th ed. 2024).

answered, "Because you pulled a gun on me," to which Mr. Moon responded, "I wasn't gonna shoot you." Officer Wilder subsequently accused Mr. Moon again, noting, "And then he started going for his pockets. And guess what, he pulled a gun out, and pointed it right at me." Mr. Moon responded, "No, I didn't. No, I didn't," and asked again, "Why would you do that?" Officer Wilder answered "Because you pulled a gun on me." Mr. Moon then indicated, "I wasn't going to shoot you, man. I never pulled the trigger, did I? Did I?" He added, "I wasn't going to. I'm just letting you know that."

Courts have repeatedly recognized that the leveling of accusations by law enforcement can constitute interrogation. *See*, *e.g., Innis*, 446 U.S. at 299 (characterizing law enforcement positing of guilt of a suspect where the suspect is in custody as an interrogation); *United States v. Reyes*, 202 F. Supp. 3d 1209, 1214 (D. Kan. 2016) (concluding an officer engaged in custodial interrogation where the officer posited the guilt of the suspect by making accusatory statements where these accusatory statements were not responsive to questions or statements made by the suspect to the officer); *United States v. Nelson*, No. 6:24-CR-00095-JSS-LHP, 2024 WL 3471301, at *6 (M.D. Fla. July 19, 2024) (concluding that statements directly accusing a defendant of committing an offense constituted a custodial interrogation); *People v. Davis*, 115 P.3d 417, 447-48 (Cal. 2005) (concluding that accusations of a criminal offense made by law enforcement toward a suspect naturally elicit an exculpatory or inculpatory response and constitute the functional equivalent of interrogation); *Plantillas v. Cate*, No. CV-08-1194-MMM(FMO), 2009 WL 890656, at *10 (C.D. Cal. Mar. 31, 2009) (indicating "[d]irect accusations of a crime are also the functional equivalent of interrogation"); *Adams v. State*, 995 A.2d 763, 777 (Md. 2010) (determining that an accusatory statement in which the officer accused the defendant of stabbing a victim 32 times constituted the equivalent of an interrogation); *Commonwealth v. Morales*, 17 N.E.3d 1119, *1 (Mass. App. Ct. 2014) ("Because the statements by the ATF agents . . . implicitly accused the defendant of involvement in specific criminal activity the agents were investigating, a reasonable person in the defendant's circumstances would have understood them to warrant a response, and they are fairly characterized as the functional equivalent of interrogation.").

The Tennessee Supreme Court has considered a case in which a detective confronted the arrested but un-Mirandized defendant with the victim's allegations against him and held that the detective had engaged in the functional equivalent of an interrogation. *See State v. Sawyer*, 156 S.W.3d 531 (Tenn. 2005). In *Sawyer*, officers arrested the defendant and transported him to the police station where he was told they would talk to him. After they arrived, the defendant was seated across a desk from a detective. Before being advised of his rights, the detective read the suspect the arrest warrant and the affidavit of complaint, which included specific details about the crime he had allegedly committed. In response, the defendant made incriminating comments. After considering *Innis*, the Tennessee Supreme Court held as follows:

[Defendant] could have reasonably believed that the detective had begun interrogating him and that the detective's reading of the affidavit was a statement requiring a response. . . . [W]e conclude that under the facts and circumstances of the present case, the detective's action in reading the affidavit to [defendant] was the functional equivalent of interrogation.

*Id.* at 535-36.

The Tennessee Supreme Court also recognized accusations as the functional equivalent of an interrogation in *R.D.S. v. State*, 245 S.W.3d 356 (Tenn. 2008). In that case, a law enforcement officer told a minor student that she was going to search his truck, which was parked on school grounds. The officer asked him "if there was anything in his vehicle that should not be there." *Id.* at 360. After the defendant responded in the negative, the officer opened the truck's door, removed a bag of marijuana, and showed it to the defendant, stating, "Oh, except for this marijuana." *Id.* at 361. The defendant, faced with this accusation, then made incriminating statements. The Tennessee Supreme Court held that the officer's words and actions in confronting the defendant with the bag were the functional equivalent of interrogation. *Id.* at 363.

In *State v. Hubbard*, this court assessed whether an interrogation had occurred where an officer detained a suspect, informed him "that he was 'under suspicion of having broken into a vehicle on the lot,' . . . put the defendant in the back of his squad car[,] and . . . [then said the following]: '[T]hat was pretty bold what you did because of the fact there's cameras out here. I don't know if you know it, but it was an off duty police officer that saw you doing what you were doing and he made the phone call.'" *State v. Hubbard*, No. W2016-01521-CCA-R3-CD, 2017 WL 2472372, at *4 (Tenn. Crim. App. June 7, 2017). This court noted the statement was not in response to a question from the defendant and concluded that, even though the officer had not asked a question, the officer "should have known that this statement was reasonably likely to elicit an incriminating response." *Id*. at 5.

In the present case, the officer repeatedly, in an agitated voice, leveled serious accusations against Mr. Moon over the course of more than seven minutes. The officer who leveled the accusations was both a witness and victim of Mr. Moon's criminal conduct. The officer, using evocative language, repeatedly asserted that Mr. Moon had pulled a gun on him and accused Mr. Moon of attempting to shoot him. The officer made these statements during the course of a dialogue in which he shifted back and forth between communicating with bystanders in Mr. Moon's immediate presence and communicating with Mr. Moon directly. The bystanders included people whom Mr. Moon knew. The officer made these statements while Mr. Moon was suffering under extreme distress from having been shot five times and while the officer was addressing Mr. Moon's medical needs, which were significant.

6

In my view, accusations made under the circumstances of the present case are reasonably likely to elicit an inculpatory or exculpatory response.[3] In reaching this conclusion, I do not view Officer Wilder's actions as constituting an intentional attempt to elicit an incriminating statement from Mr. Moon. Such intent, however, is unnecessary for the words or actions of a law enforcement officer to constitute an interrogation. Addressing the standard for assessing whether police should know their words or actions are reasonably likely to elicit an inculpatory or exculpatory response from a suspect, the United States Supreme Court explained:

> The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Innis*, 446 U.S. at 301-02.

Mr. Moon's response addressing Officer Wilder's repeated accusations is far from unforeseeable. If anything, failure to respond to such accusations, under the circumstances of the present case, would be more unexpected. Mirroring this understanding, the prosecutor in the present case assumed responses to the accusations would be warranted. In this vein, the prosecutor argued to the jury that Mr. Moon's failure to deny that he pulled a gun on Officer Wilder, in response to Officer Wilder's repeated statements that he had done so, constituted evidence that Mr. Moon had, in fact, pulled a gun on Officer Wilder.

My understanding that the parameters of *Miranda* have been transgressed in the present case should not be understood as an assertion that the officer engaged in conduct

---

[3] Additionally, in the present case, unlike in *Innis* itself wherein the officer's actions were found not to be the functional equivalent of interrogation, Officer Wilder "knew that [Defendant] was unusually disoriented or upset," having been shot five times. *Innis*, 446 U.S. at 303. Additionally, the statements made by the officer "were particularly evocative." *Id*. Furthermore, the statements were not "off hand remarks" nor were they a brief remark but instead repeated accusations of guilt over the course of approximately seven minutes in the defendant's presence. *Id*. Furthermore, the statements did not involve an appeal to some unknown aspect of conscience of which the officer was unaware but instead pushed directly upon the defendant's self-interest in connection with being accused of a crime. *Id*.

7

that was unreasonable or in bad faith. *See generally*, *e.g.*, *Maryland v. King*, 569 U.S. 435, 456 (2013) (stating that "the Fifth Amendment's protection against self-incrimination is not, as a general rule, governed by a reasonableness standard"); *Fisher v. United States*, 425 U.S. 391, 400 (1976) (stating that "the Fifth Amendment's strictures, unlike the Fourth's, are not removed by showing reasonableness"); *United States v. Newton*, 369 F.3d 659, 675 (2d Cir. 2004) (noting that "*Miranda*'s concern is not with . . . the objective reasonableness" of law enforcement's actions); *United States v. Smith*, 3 F.3d 1088, 1097 (7th Cir. 1993) (explaining that the Fourth Amendment analysis is driven by reasonableness but that *Miranda* instead is a product of a "completely different analysis" that is "much narrower"); *People v. Mangum*, 48 P.3d 568, 572 (Colo. 2002) (observing that there is no good faith exception to *Miranda*); *State v. Henderson*, 510 S.W.2d 813, 822 (Mo. Ct. App. 1974) ("Unlike the [F]ifth [A]mendment's right against self-incrimination which by its language is unqualified, the [F]ourth [A]mendment's right is qualified by and is dependent upon the reasonableness of the particular search and seizure."); *Bates v. State*, 494 S.W.3d 256, 283 (Tex. App. 2015) (Burgess, J., concurring) (observing that "reasonableness is not an exception to the Fifth Amendment and *Miranda*"). That does not mean *Miranda* is without exceptions,[4] but the State has not asserted that any of those exceptions are applicable in the present case. One of the enduring critiques of *Miranda* is reflected in Justice Scalia's observation that *Miranda* imposes "'prophylactic' rules that go beyond the right against compelled self-incrimination." *Dickerson v. United States*, 530 U.S. 428, 450 (Scalia, J., dissenting). That may be so, but the role of this court is to give effect to *Miranda* doctrine as articulated by the United States Supreme Court, not to resist it.

Accordingly, while nothing in the facts suggests to me that Officer Wilder acted in a manner intentionally seeking to circumvent *Miranda*, an exculpatory or inculpatory response to Officer Wilder's actions and words is far from unforeseeable; to the contrary, such a response is the most reasonable and foreseeable consequence of Officer Wilder's repeated leveling of accusations against Mr. Moon under the circumstances of the present case. Mr. Moon had been shot five times at close range by the officer. He was in extraordinary distress. The officer who had shot him became a critical person tending to Mr. Moon medically. While Mr. Moon was in this distressed condition, the officer engaged in a dialogue in which he shifted between speaking in Mr. Moon's presence to bystanders, including persons whom Mr. Moon knew, and directly to Mr. Moon. The repeated accusations were made by the officer in an understandably agitated voice and using evocative language. Under these circumstances, it was an entirely reasonable response, and far from unforeseeable, that Mr. Moon would respond to Officer Wilder's repeated accusations by stating something inculpatory or exculpatory. This is a foreseeable natural response to an accusation of criminal wrongdoing. The likelihood of such a response only increases where the serious accusations are advanced in front of persons that the individual

---

[4] *See generally* Ronald J. Rychlak, *Baseball, Hot Dogs, Apple Pie, and Miranda Warnings*, 50 Tex. Tech L. Rev. 15, 28 n.112 (2017) (listing examples of *Miranda* exceptions, including the public safety exception, a jailhouse informant exception, and an exception for routine booking questions).

knows. The likelihood further increases given that the accusations are being leveled by the very person whose actions may be critical to Mr. Moon's surviving his multiple gunshot wounds. Under the *Innis* test, given the circumstances of this case, Officer Wilder's words and actions constitute an interrogation. *Innis*, 446 U.S. at 301 & n.5 (indicating that interrogation refers "to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit" an inculpatory or exculpatory response).

This does not end our analysis, however. Initially, it may appear that the trial court's error regarding the application of *Miranda* in the present case could be dismissed as harmless error. After all, Mr. Moon repeatedly stated that he was not going to pull the trigger, which is seemingly favorable to his defense in this attempted murder prosecution. In reviewing the record, however, including the evidence presented and the arguments before the jury, it becomes apparent that error in admitting Mr. Moon's post-shooting statements to Office Wilder into evidence was not harmless.

The Tennessee Supreme Court has indicated that "[t]he erroneous admission of evidence obtained in violation of a defendant's *Miranda* rights is a non-structural constitutional error." *State v. Climer*, 400 S.W.3d 537, 569 (Tenn. 2013). The Tennessee Supreme Court has also indicated that

> non-structural constitutional errors do not require automatic reversal and are, therefore, subject to a harmless error analysis. However, the burden on the State to demonstrate that a non-structural constitutional error is harmless remains quite stringent. The existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless. The test used to determine whether a non-structural constitutional error is harmless is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"

*State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008) (internal citations omitted).

In assessing the impact of the post-shooting statements made by Mr. Moon to Officer Wilder, it is important to consider that Mr. Moon presented a layered defense. The primary outer rampart of his defense was that he never pulled a gun on Officer Wilder; consequently, he asserted that he plainly did not attempt to kill Officer Wilder with a gun that he had not pulled. As a fallback secondary defensive position, Mr. Moon asserted that even if the jury believed Officer Wilder that Mr. Moon had pulled a gun on the officer, Mr. Moon did not try to pull the trigger. In considering the proof in this case, Mr. Moon admitted to having a gun in his waistband. In his rendition of events, he suggested that Officer Wilder must have seen the gun while trying to stop Mr. Moon from swallowing the meth. Mr. Moon asserted that Officer Wilder, who had a negative view of Mr. Moon, then

9

responded in a panic to unexpectedly seeing a gun in Mr. Moon's waistband. Officer Wilder, however, testified that Mr. Moon did pull a gun on him. Though other witnesses saw the interaction to varying degrees, no other witness, including another law enforcement officer who arrived at the scene, saw Mr. Moon pull a gun on Officer Wilder. None of the other witnesses saw a gun in Mr. Moon's hand. The State offered testimony that there were various visual obstructions that helped to explain why these other witnesses did not see Mr. Moon pull the gun or see the gun in Mr. Moon's hand. The case ultimately turned on the jury's assessment of the credibility of Officer Wilder and Mr. Moon, as well as the weight given to the other witnesses who did not see Mr. Moon pull a gun or a gun in Moon's hand, whose testimony supported Mr. Moon's version of events.

In presenting and arguing its case, the State employed Mr. Moon's statements in the wake of the shooting as its only evidence bolstering Officer Wilder's version of the events and to undermine Mr. Moon's credibility. The prosecutor argued in closing that the statements made by Mr. Moon that he was not going to shoot are inconsistent with the gun being in his waistband and instead consistent with him having pulled the gun on Officer Wilder. The prosecutor's contention was that, if Mr. Moon was being truthful about the gun remaining in his waistband, he would have responded to Officer Wilder's accusations by stating that he had not pulled a gun, rather than by stating that he did not intend to shoot the gun or did not squeeze the trigger.[5] In other words, the prosecutor asserted that Mr. Moon's statements after the shooting are more consistent with having pulled a gun on Officer Wilder and seeking to minimize the seriousness of his actions than with having not pulled a gun at all. In addition to utilizing Mr. Moon's statements as evidence bolstering Officer Wilder's rendition of events, the prosector also expressly utilized Mr. Moon's statements to undermine Mr. Moon's credibility. Having posited that the statements reflected that there was a gun in Mr. Moon's hand rather than waistband, the prosecutor asserted that Mr. Moon's statements after the shooting conflicted with his testimony at trial, in which he asserted he never pulled a gun on Officer Wilder. The prosecutor asserted that this meant Mr. Moon was telling different, inconsistent stories about what had happened. The prosecutor asserted that this demonstrated that Mr. Moon is an unreliable and untruthful individual whose testimony the jury should not find credible.

Given the importance of Mr. Moon's post-shooting statements in bolstering Officer Wilder's testimony and undermining Mr. Moon's credibility in the present case, in my view, it is not possible to conclude "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *See Rodriguez*, 254 S.W.3d at 371. Accordingly, if *Miranda* was violated, then the error was not harmless.

In reaching this conclusion, I do not view Officer Wilder's conduct as an attempt to subvert the protections of *Miranda* or as a bad faith intentional act seeking to elicit an

---

[5] As noted above, this argument itself from the prosecutor also points towards the reasonableness of understanding Officer Wilder's words and actions as constituting an interrogation.

10

incriminating statement from Mr. Moon. The present case pushes upon some of the underlying tensions as to whether the protections of *Miranda* extend further than what is constitutionally demanded by the text of the United States Constitution. *See generally Chavez v. Martinez*, 538 U.S. 760, 772 (Thomas, J., plurality opinion) (describing *Miranda* "as a prophylactic measure to prevent violations of the right protected by the text of the Self-Incrimination Clause" that goes beyond what is constitutionally required). Nevertheless, such inquiries are not before us. Our role is more limited in scope. We are confronted with assessing whether, under the test as delineated by the United States Supreme Court, the admission of Mr. Moon's post-shooting statements violated the safeguards afforded by *Miranda*. My colleagues have thoughtfully examined the matter and reached the conclusion that no interrogation occurred. I respectfully disagree with their conclusion on this issue. Additionally, the record demonstrates this evidence was utilized by the prosecutor as a significant boost to Officer Wilder's testimony and to undermine Mr. Moon's testimony. Given the applicable standard for assessing whether admission of this evidence was harmless, in my view, the State cannot demonstrate that the improperly admitted evidence was harmless beyond a reasonable doubt.


 s/ Jeffrey Usman
JEFFREY USMAN, JUDGE

11